**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**STEPHEN CARLESON and**　　　　　　　　　　　　　　　　**PLAINTIFFS**
**PRODUCERS CREDIT**
**PROTECTION GROUP, INC.**

v.　　　　　　　　CASE NO. 4:16-CV-00841 BSM

**MIDCON GATHERING, LLC**　　　　　　　　　　　　　　　　**DEFENDANT**

## ORDER

Defendant MidCon Gathering LLC's motion for summary judgment [Doc. No. 46] is granted because Arkansas law does not allow plaintiffs to be compensated for the insurance product and services they agreed to provide.

## I.  BACKGROUND

MidCon Gathering LLC is an oil and gas gathering company based in Texas that markets the transportation of fuels and refined products. Pl.'s Resp. Def.'s Statement of F. ("Facts") ¶ 6, Doc. No. 53. This practice is called "midstream gathering." Typically, companies like MidCon use a letter of credit as security to purchase crude oil from producers, then they sell the oil to upstream buyers. *Id.* ¶¶ 13, 14. In Fall 2013, Midcon was searching for ways to generate more capital so it could expand its volume of business. *Id.* ¶ 16. A mutual acquaintance of plaintiff Stephen Carleson and certain MidCon agents put the parties in contact, and the parties began discussing new methods to finance MidCon's midstream gathering business. Holt Aff. ¶ 5, Doc. No. 51-1, at 22. Carleson formed Producers Credit Protection Group, Inc. ("PCPG") in 2013 for the purpose of "selling credit

insurance policies to various oil producers." Facts ¶ 2. Carleson claims extensive experience in management of financial assets and risk assessment, Carleson Aff. ¶ 2, Doc. No. 51-1, at 4, but he admits he has not had an active Arkansas insurance license since 2009. Carleson Dep. 25:10–14, Doc. No. 46-3.

In November 2013 and December 2014, Carleson and various MidCon agents engaged in conference calls, physical meetings, and email exchanges so Carleson could evaluate MidCon's credit needs. Carleson Aff. ¶¶ 5, 7, 8; Holt Aff. ¶ 6. Jackson, an agent of MidCon, disclosed that he could bring more business than the company's limited credit lines could support, and MidCon needed $25 million to $100 million to secure the business available to it. Carleson Aff. ¶¶ 5, 14. The parties discussed the low risk involved in midstream gathering, the length of credit or billing cycles, and the methods typically used in midstream gathering to secure purchase agreements from oil producers. Those methods include cash payment and bank-issued letters of credit. *Id.* ¶ 5. Carleson asked whether Jackson had ever seen credit insurance policies used. *Id.* Jackson said he had not due to issues related to the terms credit insurance policies use to pay claims. *Id.* ¶¶ 5, 14. Specifically, once a credit insurance policy claim is filed, it generally takes approximately 90 to 180 days to receive payment on the claim, which is not acceptable to producers. *Id.* ¶¶ 14, 27. Further, letters of credit posed a problem because of large collateral requirements. *Id.* ¶ 13.

Carleson claims MidCon agreed to pay him in exchange for introducing it to an insurance company that would issue it a satisfactory credit insurance policy. *Id.* ¶ 9.

2

Carleson also claims MidCon originally agreed to pay him 50 cents per barrel of oil for barrels gathered using the "credit facility" Carleson designed, but MidCon later reduced the negotiated price to 30 cents per barrel. *Id.* ¶¶ 9, 23. Carleson also agreed to pay the insurance policy premium on behalf of MidCon at some point during the negotiations, though ultimately MidCon paid its own premium for the credit insurance policy it purchased from Euler Hermes on November 19, 2014. Facts ¶¶ 21, 25, 31. The parties exchanged some drafts of agreements in which they seemed to negotiate back and forth regarding the "credit facility" Carleson said he would develop and other related terms, but no written agreement relating to the "credit facility" was ever executed. *See, e.g.*, Draft Agreement, Doc. No. 7-1, at 1–5.

Carleson does not explain what a "credit facility" is, but he treats it as tantamount to the credit insurance policy purchased by MidCon. *See, e.g.*, Facts ¶ 2 ("Plaintiffs admit PCPG is a company formed in 2013 for the purported purpose of selling credit insurance policies to various oil producers."); Carleson Dep. 55:13–16 ("[PCPG is] a little company I formed to factor receivables and do these – this credit – provide credit facilities for midstreams and gatherers."); Carleson Aff. ¶¶ 14, 15 (explaining "some kind of insurance indemnification was the only way to achieve" MidCon's goal, that a "credit default policy was the closest option," and that Carleson was "creating a custom policy with terms as close to a letter of credit as possible"). In any event, the fact that Carleson agreed to pay the premium for the credit insurance policy he designed for MidCon demonstrates that the credit insurance policy at issue was part of the credit facility for which he now seeks compensation.

3

Carleson claims MidCon's refusal to pay him for the credit facility he designed and developed constitutes breach of contract and unjust enrichment. Am. Compl. ¶¶ 10, 13, 14, 16, Doc. No. 7.

## II.  LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249–50 (1986). Once the moving party demonstrates that there is no genuine dispute of material fact, the non-moving party may not rest upon the mere allegations or denials in his pleadings. *Holden v. Hirner*, 663 F.3d 336, 340 (8th Cir. 2011). Instead, the non-moving party must produce admissible evidence demonstrating a genuine factual dispute requiring a trial. *Id.* Importantly, when considering a motion for summary judgment, all reasonable inferences must be drawn in a light most favorable to the nonmoving party. *Holland v. Sam's Club*, 487 F.3d 641, 643 (8th Cir. 2007). Additionally, the evidence is not weighed, and no credibility determinations are made. *Jenkins v. Winter*, 540 F.3d 742, 750 (8th Cir. 2008).

## III.  DISCUSSION

A contract made by one engaged in a particular occupation without a license cannot be enforced when a statute prohibits the person from engaging in that occupation without a license. *Savo v. Miller*, 276 S.W.2d 67, 69 (Ark. 1954). The same rule applies to an implied contract, which is the type of contract at issue under a theory of unjust enrichment. *See Dunn v. Phoenix Vill., Inc.*, 213 F. Supp 936, 949–50 (W.D. Ark. 1963) ("A promise will not be

implied where an express promise would be contrary to law and is forbidden."). Section 23-64-503 of the Arkansas Code provides, "A person shall not sell, solicit, or negotiate insurance in this state for any class or classes of insurance unless the person is licensed . . . ." Ark. Code Ann. § 23-64-503. Section 23-64-201 further requires a license to "consult, counsel, or advise others on matters of insurance needs or coverages under any insurance policy or contract of insurance . . . ." *Id.* § 23-64-201(b)(1). It is undisputed that Carleson has not had an active Arkansas insurance license since 2009. Carleson Dep. 25:10–14; Facts ¶ 4. It is also undisputed that PCPG was an Arkansas corporation; that PCPG had its principal place of business in Arkansas; that PCPG did not conduct business in Texas, which is where MidCon conducts its business; and that the negotiations at issue occurred in Arkansas. Am. Compl. ¶¶ 2–3, 9; Doc. No. 9, at 2–4. In other words, Carleson did not have an insurance license in Arkansas at the time of the conduct at issue, which occurred in Arkansas.

The issue, therefore, is whether, under the law, the conduct of Carleson or PCPG qualifies as selling, soliciting, negotiating, consulting, counseling, or advising. "Sell" means "to exchange a contract of insurance by any means, for money or its equivalent, on behalf of an insurance company." Ark. Code Ann. § 23-64-502(13). Carleson admits he formed his company, PCPG, specifically for the "purpose of selling credit insurance policies to various oil producers." Facts ¶ 2. Additionally, Carleson asserts that one of his obligations under the agreement at issue was to pay the premium for the credit insurance policy as part of the "credit facility" he agreed to create for MidCon in exchange for compensation. *Id.* ¶

31; Carleson Aff. ¶ 28. Similarly, "solicit" means "attempting to sell insurance or asking or urging a person to apply for a particular kind of insurance from a particular company." Ark. Code Ann. § 23-64-502(14). The business activity Carleson agreed to perform in exchange for compensation qualifies as "selling" and "soliciting."

"Negotiate" means "the act of conferring directly with or offering advice directly to a purchaser or prospective purchaser of a particular contract of insurance concerning any of the substantive benefits, terms, or conditions of the contract, provided that the person engaged in that act either sells insurance or obtains insurance from insurers for purchasers." *Id.* § 23-64-502(11). Carleson conferred directly with MidCon (a purchaser or prospective purchaser of a particular contract of insurance) concerning the substantive benefits, terms, and conditions of the credit insurance policy at issue, specifically the time it would take to pay a filed claim, the credit limits, and the cost of the policy. Carleson Aff. ¶¶ 15 ("I was working on the possibility of creating a custom policy with terms as close to a letter of credit as possible."), ¶ 16 ("I could now negotiate for additional terms and pricing to make this or a competitor policy more widely acceptable for more producers."), ¶ 20 ("We began negotiating terms for the payment of claims and options for the policies deductible."), ¶ 21 ("I asked him how large of policy will MidCon need. He said between $50 million and $100 million per 50-day credit cycle with more to come over time. . . We educated Deniese and negotiated with QBE Insurance and Euler Hermes Insurance."). Further, the draft agreement Carleson attached to his complaint demonstrates that even Carleson understood he was offering "advice" directly to MidCon regarding the "credit facility" he agreed to create and

sell to MidCon. Draft Agreement ¶¶ 6, 9, 12. Finally, it is clear that the conduct contemplated by the agreement involved Carleson or PCPG obtaining insurance from insurers for purchasers and selling it. Carleson Aff. ¶ 17 ("I worked for several months trying to convince an insurance company to consider writing a policy."), ¶ 18 ("we met at my house working to obtain a policy for Spears and or MidCon"), ¶ 21 ("[MidCon] asked [Carleson] to focus [his] efforts on obtaining a policy for MidCon that would satisfy Newfield Production."); Facts ¶¶ 2, 31.

The statute does not define "consult," "counsel," or "advise," but it does define an "insurance consultant" as "an individual, firm, limited liability company, or corporation which, for a fee, *in any manner* advises or counsels anyone as to his or her insurance needs and coverages under any insurance policy or contract." Ark. Code Ann. § 23-64-102(5)(A) (emphasis added). This language is quite broad and captures any activity arguably omitted by "selling," "soliciting," or "negotiating." Again, Carleson's own drafted agreement shows that he was offering "advice" to MidCon regarding its insurance needs. Draft Agreement ¶¶ 6, 9, 12.

Carleson wants compensation for a credit insurance policy a third-party insurance company sold to MidCon, which he designed, developed, and intended to sell to MidCon as part or all of something he called a "credit facility." The "advice" for which he seeks compensation was not "incidental" to some other "business or professional activity other than insurance consulting." *See* Ark. Code Ann. § 23-64-102(5)(B). It is apparent that Carleson never explains what a "credit facility" is or how it is distinguishable from a credit insurance

policy because doing so would betray the fact that he was rendering insurance advice and selling and negotiating insurance without a license to do so, which prevents him from being compensated.

## IV. CONCLUSION

For these reasons, MidCon's motion for summary judgment [Doc. No. 46] is granted, and this case is dismissed with prejudice.

IT IS SO ORDERED this 12th day of June 2018.

_____
UNITED STATES DISTRICT JUDGE